Naomi A. Igra (SBN 269095)
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street
Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 7495
Facsimile: +1 415 772 7400

Joseph R. Guerra (*pro hac vice* to be submitted)
jguerra@sidley.com
Erika L. Maley (*pro hac vice* to be submitted)
emaley@sidley.com
Sean C. Griffin (*pro hac vice* to be submitted)
sgriffin@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8228
Facsimile: +1 202 736 8711

*Attorneys for Plaintiffs Biotechnology Innovation*
*Organization and Biocom California*

Beth S. Brinkmann (SBN 129937)
bbrinkmann@cov.com
Mark Mosier (*pro hac vice* to be submitted)
mmosier@cov.com
Conrad Scott (*pro hac vice* to be submitted)
cscott@cov.com
COVINGTON & BURLING LLP
1 CityCenter
850 10th Street N.W.
Washington, D.C. 20001
Telephone: +1 202 662 5312
Facsimile: +1 202 662 6291

*Attorneys for Plaintiff California Life Sciences*
*Association*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIOTECHNOLOGY INNOVATION ORGANIZATION; CALIFORNIA LIFE SCIENCES ASSOCIATION; and BIOCOM CALIFORNIA,<br><br>     *Plaintiffs*, | Civil Case No: 20-cv-08603<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

v.

ALEX M. AZAR, II, in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SEEMA VERMA, in her official capacity as ADMINISTRATOR OF THE CENTERS FOR MEDICARE AND MEDICAID SERVICES; and THE CENTERS FOR MEDICARE AND MEDICAID SERVICES,

*Defendants.*

**ADMINISTRATIVE PROCEDURE ACT CASE**

Plaintiff Biotechnology Innovation Organization ("BIO"), on behalf of itself and its members, plaintiff California Life Sciences Association ("CLSA"), on behalf of itself and its members, and plaintiff Biocom California ("Biocom"), on behalf of itself and its members (together, "Plaintiffs"), bring suit against Alex M. Azar, in his official capacity as the Secretary of the United States Department of Health and Human Services ("HHS"); HHS; Seema Verma, in her official capacity as the Administrator of the Centers for Medicare and Medicaid Services ("CMS"); and CMS (together, "Defendants"), and allege as follows:

**INTRODUCTION**

1.      This lawsuit challenges HHS's issuance, during the final days of the Trump Administration, of a sweeping new rule that alters the statutorily prescribed method for determining reimbursement payments that healthcare providers receive for administering "the top 50" prescription medications to Medicare patients in hospital outpatient departments and other facilities.[1] This eleventh-hour rule was issued in clear violation of the notice-and-comment requirements of the Administrative Procedure Act ("APA"), and is substantively unlawful and *ultra vires*. The rule is an impermissible attempt by HHS to use its limited authority to "test" new payment "models" as a basis for completely rewriting the reimbursement formula Congress enacted.

2.      Over two years ago, in October 2018, HHS announced that it might revise the reimbursement formula based on an "international pricing index." That idea was not set forth in a proposed rule, but rather in an advanced notice of proposed rulemaking. In November 2020, HHS issued a new and different reimbursement concept as an immediately effective interim final rule that will begin altering reimbursement payments as of January 1, 2021—*before the agency even receives*, much less *considers*, the comments it has solicited on this rule. That action clearly violates the APA.

3.      HHS has rushed to put its new "Most Favored Nation" Rule ("MFN Rule") into effect despite its recognition that there is no "reliable precedent in the U.S. market" for its new reimbursement formula, and that there is "an unusually high degree of uncertainty" about the

---

[1] *See* Final Rule, Most Favored Nation (MFN) Model, 85 Fed. Reg. 76,180 (Nov. 27, 2020) (to be codified at 42 C.F.R. pt. 513) ("MFN Rule"); Fact Sheet: Most Favored Nation Model for Medicare Part B Drugs and Biologicals Interim Final Rule with Comment Period, CMS (Nov. 20, 2020), https://tinyurl.com/y65f3qr6.

formula's potential impacts. 85 Fed. Reg. at 76,237. Indeed, HHS acknowledges that, as a result of the MFN Rule, some healthcare providers may suffer extreme financial hardship, *id.* at 76,222, and some Medicare patients may receive inferior therapies with "lower efficacy or greater risks," or end up "postponing or forgoing treatment" altogether. *Id.* at 76,244. The agency's own estimates show that, within three years, nearly one in five Medicare Part B patients may have *no* access to drugs covered by the MFN Rule, *id.* at 76,237–38, and that half of the projected savings to Medicare "would be due to lost utilization" of these drugs, *id.* at 76,239. In addition, the MFN Rule will deprive emerging biotechnology companies of their ability to attract crucial financing by seriously impacting their potential for market-based returns. Such decreases in investment will place critical research at risk, threatening the ability to develop innovative new drugs, especially for rare diseases.

4.      HHS's purported justification for giving this unprecedented and harmful rule immediate effect is that economic disruptions caused by the COVID-19 pandemic have "given rise to an urgent need for swift action to reduce drug prices," and that implementation of its new reimbursement model will provide "immediate relief to Medicare beneficiaries." *Id.* at 76,249. This contention is baseless, and cannot justify dispensing with notice and comment on a new policy that the President has described as "transformative."[2] Indeed, the Administration has been pursuing similar measures for years and never previously asserted that they are a necessary response to the pandemic. The MFN Rule itself excludes from the new pricing structure all drugs authorized "to treat patients with suspected or confirmed COVID-19," 42 C.F.R. § 513.130(b)(ix), on the ground that applying the MFN Rule to COVID-19 drugs would impair the "rapid, widespread availability of such drugs in the U.S. to treat patients with suspected or confirmed COVID-19." 85 Fed. Reg. at 76,191. And this Court recently rejected a similar claim that the economic effects of pandemic allowed the outgoing Administration to make sweeping policy changes immediately effective without notice-and-comment. *Chamber of Commerce v. U.S. Dep't of Homeland Sec.*, No. 4:20-cv-7331, 2020 WL 7043877 (N.D. Cal. Dec. 1, 2020).

5.      Further, the whole premise of the new Rule is that HHS is *testing* a new

---

[2] Remarks by President Trump at Signing of Executive Orders on Lowering Drug Prices, The White House,  (July 24, 2020 from 3:45 PM ET to 4:28 PM ET), https://tinyurl.com/yxhpxvbs.

1    reimbursement model that it believes will reduce drug prices. HHS cannot claim that it is testing a

2    model to see *if* it reduces drug prices, then declare that the Rule should go into effect immediately

3    because HHS knows that its model *will immediately* reduce drug prices. HHS certainly cannot make

4    such a declaration in light of its admission that its unprecedented model involves "an unusually high

5    degree of uncertainty," 85 Fed. Reg. at 76,237, and could end up harming—rather than helping—

6    patients, by forcing them to accept riskier or less effective treatments or to forgo treatment during

7    the COVID-19 pandemic. In fact, while HHS claims that implementing the MFN Rule as an interim

8    final rule is necessary to ensure that the pandemic does not cause seniors to "stint[] on care," *id.* at

9    76,249, it admits that some of the savings it projects are "attributable to beneficiaries *not accessing*

10   *their drugs through the Medicare benefit*," *id.* at 76,237 (emphasis added).

11          6.       Although HHS's premature conclusions about the outcome of its purported test do not

12   justify its failure to comply with the APA's notice-and-comment requirements, they confirm the

13   other overarching flaw in its action—namely, that the MFN Rule is not a valid exercise of HHS's

14   authority to test models. HHS has invoked a provision that allows it to "test" certain payment and

15   patient care "models" on a "defined population," for which "there are deficits in care leading to poor

16   clinical outcomes or potentially avoidable expenditures." *See* 42 U.S.C. § 1315a. HHS can expand a

17   test if certain criteria are met, and must report the results of those tests so Congress can consider

18   adopting models into law. *Id.* The MFN Rule plainly falls outside the ambit of this limited authority,

19   and is instead an impermissible attempt to rewrite the "minutely detailed" reimbursement formula

20   Congress enacted for Medicare Part B drugs. *Hays v. Sebelius*, 589 F.3d 1279, 1282 (D.C. Cir. 2009)

21   (citation omitted).

22          7.       The reimbursement formula Congress enacted for Medicare Part B drugs is based

23   upon the competitive U.S. market for pharmaceutical products in order to ensure that healthcare

24   providers do not lose money on the drugs that they administer to patients. In general, Medicare Part

25   B covers medical services in the outpatient setting (*e.g.*, visits to a physician's office or a hospital

26   outpatient facility). Pursuant to that coverage, Part B reimburses providers when they administer

27   drugs to patients during those visits. These provider-administered drugs include many injectable and

28   infusion products that treat serious or life-threatening diseases, like cancer, autoimmune conditions,

or end-stage renal disease ("ERSD"). In most cases, the providers must pay out of pocket to purchase and stock the drugs they administer and may seek reimbursement from Medicare only once the drug has been administered to a Medicare patient

8.      Under the existing statute, the government reimburses providers for Part B drugs under a formula that relies on the "average sales price" ("ASP") of the drugs in the United States, plus a small mark-up. 42 U.S.C. § 1395w-3a(b). The MFN Rule disregards that congressional design. It uses the lowest price charged *outside* of the United States, in one of 22 specified foreign countries, as the basis for Medicare reimbursements. Far from testing this model on a "defined population" and in a manner that can later be expanded in a second phase of testing, HHS has made the reimbursement standard immediately mandatory for the entire country for 50 different drugs representing approximately 75% of Part B drug spending. 85 Fed. Reg. at 76,193. The Rule was obviously not designed to test a hypothesis, but instead to alter drug pricing on a wholesale basis.

9.      The Administration's own actions and statements prior to issuance of the MFN Rule confirm this. Legislative proposals to tie Medicare Part B reimbursement rates to foreign drug prices have been raised since at least 2018, but Congress did not adopt them. Yet, after having failed to secure passage of such legislation, President Trump issued executive orders in the midst of the Presidential campaign that purported to "completely restructure the prescription drug market, in terms of pricing and everything else,"[3] by doing what had "never [been] done" before: creating a "Most Favored Nation" rule for drug pricing.[4] The President's September 13, 2020 Order declared that it was "the policy of the United States" that Medicare not reimburse providers more for Part B prescription drugs or biological products "than the most-favored-nation price,"[5] and directed HHS to implement this policy through rulemaking.

10.     In accordance with these campaign-inspired directives—not the standards of its testing authority or any exigencies caused by the COVID-19 pandemic—HHS issued its new MFN Rule to "completely restructure the prescription drug market." In doing so, it has exceeded its

---

[3] Remarks by President Trump at Signing of Executive Orders on Lowering Drug Prices, The White House (July 24, 2020 from 3:45 PM ET to 4:28 PM ET), https://tinyurl.com/yxhpxvbs.
[4] *Id.*
[5] Executive order on Lowering Drug Prices by Putting America First, The White House (Sept. 13, 2020), https://tinyurl.com/yynzmtn4.

1    narrow authority to test limited models.

2        11.        The agency's action also runs counter to the Medicare Act's access to therapies

3    provision, 42 U.S.C. § 18114, because implementing foreign price controls in the United States will

4    severely undermine access to medicine in the United States, as well as eviscerate innovation and the

5    development of lifesaving medicines and other biological products.

6        12.        HHS's interpretation of the testing provision is so broad and lacking in substantive

7    limitations that, if accepted, it would render that provision—and its authorization to waive aspects of

8    the Social Security Act—unconstitutional under the non-delegation doctrine. It would also violate

9    the Presentment Clause and the constitutional principle of separation of powers.

10                                    **PARTIES**

11       13.        Plaintiff Biotechnology Innovation Organization ("BIO") is a nonprofit corporation

12   organized under the law of Washington, D.C., with its principal place of business in Washington,

13   D.C. BIO is the world's largest biotechnology trade association, representing more than 1,000

14   biotechnology companies, academic institutions, state biotechnology centers and related

15   organizations across the United States and in more than 30 other nations. Hundreds of BIO's

16   members are located in California. BIO members are involved in the research and development of

17   innovative healthcare and biotechnology products, including the first biologic products, the first

18   targeted therapies for oncology, and recombinant DNA products.[6] As described below, the MFN

19   Rule will be devastating to such biotechnology innovation.

20       14.        Plaintiff California Life Sciences Association ("CLSA") is a nonprofit organization

21   organized under California law, with its principal place of business in South San Francisco,

22   California. CLSA is the state's largest life sciences advocacy and business leadership organization,

23   and it works closely with industry, government, academia, patient groups, and others to shape public

24   policy, improve access to innovative technologies and grow California's life sciences

25   economy. CLSA serves biotechnology, pharmaceutical, medical device and diagnostics companies,

26   research universities and institutes, investors and service providers throughout the Golden State.[7]

27   _____

28   [6] A list of BIO members is available at *BIO Member Directory*, https://tinyurl.com/y4r3y5tj.
     [7] A list of CLSA members is available at *CLSA Member Directory*, https://tinyurl.com/yxvxvewc.

Over one thousand of CLSA's member companies are located in California.

15.     Plaintiff Biocom California ("Biocom") is a nonprofit corporation organized under California law, with its principal place of business in San Diego, California. Biocom is an international life sciences advocacy and business organization representing more than 1,300 members—the vast majority of which are located in California—to drive public policy, build a network of industry leaders, create access to capital, introduce cutting-edge workforce development and STEM education programs, and create robust value-driven purchasing programs. Biocom serves life sciences, pharmaceutical, medical device, genomics, and bioinformatics companies.

16.     The MFN Rule is of vital concern to BIO, CLSA, Biocom and their members and partners. Several of BIO's, CLSA's, and Biocom's members manufacture drugs and biological products subject to the MFN Rule, and they will be directly harmed by the MFN Rule. BIO, CLSA, and Biocom also have members who are academic centers, investors, and research institutes, who will be harmed by the MFN Rule because it will decrease investment in pharmaceutical innovation. This suit seeks to protect interests that are germane to plaintiffs' purposes because the MFN Rule directly impacts the goals of plaintiffs to advocate for public policies that encourage investment in innovative biotechnology products. None of the claims asserted in this complaint nor the relief sought require plaintiffs' members to be parties.

17.     California is home to more than 3,700 life sciences companies. This innovation ecosystem in California has built companies that produce some of the world's most important and innovative therapies. California's life sciences sector directly employs 323,723 people throughout the state in for-profit companies, universities, and nonprofit research institutes. When indirect and induced employment are factored in, the sector accounts for almost 1 million jobs. The Bay Area led the state with 87,441 direct life sciences jobs. In 2019, California companies entered more than 1,380 medicines into clinical trials. Many are intended to treat areas of major unmet medical need, such as cancer, neurodegenerative conditions, and infectious diseases. The MFN Rule directly threatens this critical innovation ecosystem.

18.     Defendant HHS is responsible for administering, among other things, the Medicare programs and has authority to test payment models under the Patient Protection and Affordable Care

Act, Pub. L. No. 111-148, § 3021, 124 Stat. 119, 389 (2010) (the "PPACA") (codified at 42 U.S.C. § 1315a).

19.     Alex M. Azar is Secretary of HHS (the "Secretary") and is sued in his official capacity.

20.     Defendant Seema Verma is the Administrator of CMS, and is sued in her official capacity.

21.     Defendant CMS is a federal agency within HHS, and the Center for Medicare and Medicaid Innovation ("CMMI") is a component of CMS that is responsible for administering the PPACA's provision for testing models. CMS, together with HHS, promulgated the MFN Rule challenged in this lawsuit.

## JURISDICTION AND VENUE

22.     Subject matter jurisdiction is founded on 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States.

23.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201, and this Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

24.     Venue lies in this district under 28 U.S.C. § 1391(e)(1) because this is a judicial district in which plaintiff CLSA resides, and this action seeks relief against federal agencies and their officials acting in their official capacities.

25.     The MFN Rule is an interim final rule, which constitutes final agency action. *See Career College Ass'n v. Riley*, 74 F.3d 1265 (D.C. Cir. 1996).

### FACTUAL BACKGROUND

### *The September 13, 2020 Executive Order*

26.     The MFN Rule asserts that it is an emergency response to economic disruptions caused by the COVID-19 pandemic, and that it falls within the agency's statutory authority to test payment models. However, the Administration has been seeking to tie U.S. drug prices to foreign prices one way or another for years—well before the pandemic began—and resorted to its new MFN

Rule only after it failed to secure passage of legislation.

27.     President Trump stated in his January 30, 2018 State of the Union Address that he was "direct[ing] [his] administration to make fixing the injustice of high drug prices one of our top priorities," that "[p]rices would come down" and that "[i]n many other countries, these drugs cost far less than what we pay in the United States."[8]

28.     On May 11, 2018, President Trump issued a "Blueprint to Lower Drug Prices," stating that the United States bears the "burden of financing drug development" because "[o]ther countries use socialized healthcare to command unfairly low prices from U.S. drug makers."[9]

29.     The President stated in September 2019 that he wanted Congress to address drug prices: "the American people need Congress to help," and "[l]et's get it done in a bipartisan way!"[10]

30.     Secretary Azar declared the COVID-19 pandemic to be a public health emergency on January 31, 2020, with retroactive effect to January 27, 2020. The Secretary's declaration made no mention of a need to change the way Part B drugs were reimbursed.

31.     On July 2, 2020, the President expressed his frustration with the failure to pass legislation regarding drug pricing, stating, "We MUST lower drug prices for patients!" and that "@HouseGOP . . . ha[s] SHOWN LEADERSHIP while . . . @SenateDems WALK AWAY!"[11] The President did not assert, however, that drug prices must be lowered to fight the COVID pandemic.

32.     Despite President Trump's efforts to seek passage of legislation to tie U.S. drug prices to foreign prices, and Congress' consideration of several bills that would have changed the statutory formula for Medicare drug pricing (including one that would have used international reference pricing benchmarks), Congress did not pass any such bills into law. On July 24, 2020, President Trump attempted to bypass Congress by signing four "sweeping" Executive Orders designed to "significantly lower the cost of prescription drugs while increasing access to life-saving

[8] President Donald J. Trump's State of the Union Address, The White House (Jan. 30, 2018), https://tinyurl.com/ybtdytqa (remarks as prepared for delivery).
[9] President Donald J. Trump's Blueprint To Lower Drug Prices, The White House (May 11, 2018), https://tinyurl.com/y9q5zxjm.
[10] @realDonaldTrump, TWITTER (Sept. 19, 2019, 5:42 PM), https://tinyurl.com/y4u29jtr.
[11] @realDonaldTrump, TWITTER (July 2, 2020, 5:45 PM), https://tinyurl.com/yxgr3oxz.

medications . . . ."[12] He described these four orders as "a bold and historic, very dramatic action to reduce the price of prescription drugs for American patients and American seniors."[13] He further stated that they would be the "most far-reaching prescription drug reforms ever issued by a President. Nothing even close."[14] These Executive Orders were announced in a press release entitled: "Congress Didn't Act on Prescription Drug Prices. So President Trump Did."[15]

33.     These orders were designed to "completely restructure the prescription drug market, in terms of pricing and everything else."[16] One was designed to "ensure[] the United States pays the lowest price available among economically advanced countries for Medicare Part B drugs."[17]

34.     This Executive Order, called "Lowering Drug Prices by Putting America First," was described by President Trump at the July 24, 2020 press conference. The President stated that, pursuant to this Executive Order, the United States "will determine what other medically advanced nations pay for the most expensive drugs, and instead of paying the highest price, Medicare will pay the lowest price and so will lots of other U.S. buyers."[18] He went on to state that "Medicare is the largest purchaser of drugs anywhere in the world by far. Medicare—largest purchaser of drugs in the world. And we're finally going to use that incredible power to achieve a fairer and lower price for everyone. Everyone will get a fairer and much lower price. This is not talking about one half of a percent. This is big stuff."[19] The President did not state, however, that the Executive Order would alleviate economic hardship caused by the COVID-19 pandemic, which had been ongoing for

---

[12] Congress Didn't Act on Prescription Drug Prices. So President Trump Did, The White House (July 27, 2020), https://tinyurl.com/y5zye4oe; President Donald J. Trump Is Taking Action to Lower Drug Costs and Ensure That Americans Have Access to Life-saving Medications, The White House (July 24, 2020), https://tinyurl.com/y5lyzcg7.
[13] Remarks by President Trump at Signing of Executive Orders on Lowering Drug Prices, The White House (July 24, 2020 from 3:45 PM ET to 4:28 PM ET), https://tinyurl.com/yxhpxvbs.
[14] Id.
[15] Congress Didn't Act on Prescription Drug Prices. So President Trump Did, The White House (July 27, 2020), https://tinyurl.com/y5zye4oe.
[16] Id.
[17] Id.; President Donald J. Trump Is Taking Action to Lower Drug Costs and Ensure That Americans Have Access to Life-saving Medications, The White House (July 24, 2020), https://tinyurl.com/y5lyzcg7.
[18] Remarks by President Trump at Signing of Executive Orders on Lowering Drug Prices, The White House (July 24, 2020 from 3:45 PM ET to 4:28 PM ET), https://tinyurl.com/yxhpxvbs.
[19] Id.

1    months by then.

2        35.      While President Trump reportedly signed the Executive Order on July 24, 2020, a

3    copy of this Order was not released.

4        36.      Instead, President Trump stated this Order would be held "until August 24th, hoping

5    that the pharmaceutical companies will come up with something that will substantially reduce drug

6    prices. And the clock starts right now. So it's August 24th at 12:00, after which the order on favored

7    nations will go into effect."[20]

8        37.      The Order was not released on August 24. Instead, on September 13, 2020, President

9    Trump issued a new version of the Lowering Drug Prices by Putting America First Executive Order,

10   which revoked the never-released July 24, 2020 Order of the same name.[21]

11       38.      The September 13, 2020 Executive Order states that "Americans pay more per capita

12   for prescription drugs than residents of any other developed country," and that "[i]t is unacceptable

13   that Americans pay more for the exact same drugs." *Id.* It further states that "Americans finance

14   much of the biopharmaceutical innovation that the world depends on," thereby "effectively

15   subsidizing innovation and lower-cost drugs for the rest of the world," and that the federal

16   government "should insist on, at a minimum, the lowest price at which the manufacturer sells that

17   drug to any other developed nation." *Id.*

18       39.      As to the "policy" it is intended to effect, the Executive Order states "[i]t is the policy

19   of the United States that the Medicare program should not pay more for costly Part B prescription

20   drugs or biological products than the most-favored-nation price," defined as the price available "in a

21   member country of the Organisation for Economic Co-operation and Development (OECD) that has

22   a comparable per-capita gross domestic product." *Id.*

23       40.      That Executive Order directs the HHS Secretary to "immediately take appropriate

24   steps to implement his rulemaking plan to test a payment model pursuant to which Medicare would

25

26   [20] *Id.*
     [21] Executive Order on Lowering Drug Prices by Putting America First, The White House (Sept. 13,
27   2020), https://tinyurl.com/yynzmtn4; *see id.* § 5 ("The Executive Order of July 24, 2020 (Lowering
     Drug Prices by Putting America First), is revoked.").
28

pay, for certain high-cost prescription drugs and biological products covered by Medicare Part B, no more than the most-favored-nation price."[22]

41.     The Executive Order does not refer to the COVID-19 pandemic.

42.     On September 13, 2020—the day that President Trump released the Executive Order—he tweeted that "prices are coming down FAST!"[23] The President also repeated his earlier sentiments about the breadth and far-reaching impact of this Order, tweeting: "My Most Favored Nation order will ensure that our Country gets the same low price Big Pharma gives to other countries. The days of global freeriding at America's expense are over[,]"[24] which Secretary Alex Azar echoed in his own statements, describing the Order as "historic."[25] However, no regulation or proposed rule was issued at that time.

43.     The MFN Rule was not issued until more than two months later, on November 20, 2020. It was not published as a notice of proposed rulemaking for public comment before going into effect.  Instead, it was published in the Federal Register on November 27, 2020, as an interim final rule with immediate effect. 85 Fed. Reg. at 76,180. It has a 60-day comment period, which began on the Rule's effective date and ends on January 26, 2021. *Id.* Upon the MFN Rule's release, President Trump characterized it as a "groundbreaking rule[] to very dramatically lower the price of prescription drugs," further stating that it is an "unprecedented reform" "to end global freeloading," in which higher American drug prices "effectively subsidiz[e] socialism abroad."[26]

44.     The President's remarks further suggested that the impetus for the release of the MFN Rule was the results of the November 2020 presidential election, asserting that pharmaceutical companies had run "negative advertisements against me during the campaign—which I won, by the way," and had "even decided not to assess the results of their vaccine; in other words, not come out

---

[22] *Id.* § 3.
[23] @realDonaldTrump, Twitter (Sept. 13, 2020, 2:58 PM), https://tinyurl.com/yy4nea22.
[24] *Id.*
[25] @SecAzar, Twitter (Sept. 13, 2020, 6:51 PM), https://tinyurl.com/y4sgktsr ("President Trump is continuing his historic work to lower drug prices and put American patients first. Today he is moving forward with an executive order to stop foreign free riding and ensure American patients get the discounts given to other countries.").
[26] Remarks by President Trump on Delivering Lower Prescription Drug Prices for All Americans, The White House, (Nov. 20, 2020), https://tinyurl.com/y6r4g62r.

with a vaccine until just after the election."[27] Indeed, press reports indicate that the MFN Rule was released in retaliation for the vaccine makers' alleged "failure" to announce the effectiveness of their products before the election.[28]

45.        The statements by the President and Secretary Azar did not assert that the MFN Rule was being given immediate effect in order to alleviate any economic hardships caused by COVID-19.

46.        As described below, the MFN Rule exceeds HHS' statutory and constitutional authority, and violates the notice-and-comment requirements of the APA and the Medicare Act. It will also cause serious harm to access to medicine and innovation in biotechnology, including to the members of BIO, CLSA, and Biocom.

### Statutory Requirements for Medicare Part B Coverage and Reimbursement of Certain Prescription Drugs

47.        Medicare is a four-part program that provides health insurance to seniors and persons with disabilities. "Medicare Part A provides coverage for inpatient care, i.e., care provided while a patient is admitted to a hospital or skilled nursing facility. Medicare Part B covers various other services including outpatient (or same-day) hospital care." *See generally Am. Hosp. Ass'n v. Azar*, 967 F.3d 818, 820 (D.C. Cir. 2020). Part C relates to certain health insurance programs run by Medicare Advantage Companies, and Part D covers certain prescription drugs, including vaccines. *See generally* What's Medicare?, Medicare.gov, https://tinyurl.com/yajxwvdz.

48.        Among other things, Medicare Part B covers drugs that are administered in doctor's offices, hospital outpatient clinics, or similar facilities, as well as some oral oncology medicines. *See* 42 U.S.C. §§ 1395k(a)(2)(B), 1395x(s)(20)(A)–(B). The same drugs are also administered to patients

---

[27] *Id.*

[28] *See* Paige Cunningham, The Health 202: Trump is angry at vaccine makers, so he's pushing a last-minute plan to lower drug prices, Washington Post (Nov. 17, 2020), https://tinyurl.com/yxh6swmf ("President Trump is infuriated that Pfizer and Moderna announced their coronavirus vaccines are highly effective after Joe Biden was declared the victor in the presidential election – a move Pfizer's CEO insisted wasn't politically motivated. Now the president is trying to get back at the pharmaceutical industry in the waning weeks of his administration" by issuing the MFN Rule); @realDonaldTrump, Twitter, (November 9, 2020, 7:43 PM), https://tinyurl.com/y4j68elg ("[T]he Democrats didn't want to have me get a Vaccine WIN, prior to the election, so instead it came out five days later – As I've said all along!").

who are not Medicare enrollees (for example, patients with private insurance).

49.     In crafting Medicare Part B, Congress struck a careful balance between preserving the innovation and dynamism of a free market, and ensuring beneficiaries' access to affordable treatment.

50.     Reimbursement rates—the prices Medicare pays to doctors to reimburse them for dispensing covered drugs to Medicare patients—are a key determinant of that balance. Because Medicare Part B patients pay for a portion of their own treatment in the form of cost-sharing, reimbursement rates directly affect their cost of care.  But reimbursement rates that are too low render treatment inaccessible, because healthcare providers do not have the financial ability to purchase drugs at a higher price than the price for which Medicare will reimburse them. *See* ¶¶ 86, 98, 117, *infra*.

51.     Hence, Congress chose to tie the Part B reimbursement rates to the market price for the covered drug in the United States—in Medicare parlance, its ASP. Because market prices include—by definition—an adequate return on investment to manufacturers, tying the Part B reimbursement rate to ASP also helps ensure innovation in new drugs and biologics. The relationship between market prices and Medicare prices is so important that Congress has specifically fixed it by statute.

52.     The ASP for a drug or biological generally reflects the manufacturer's sales of the product to specified categories of purchasers in the United States, net of certain discounts, rebates, and other price concessions. 42 U.S.C. § 1395w-3a(b)(4), (b)(6); 42 C.F.R. § 414.804(a).

53.     Manufacturers report ASPs for their drugs and biologicals to CMS by National Drug Code ("NDC"), 42 C.F.R. § 414.804(a)(1).

54.     ASP reimbursement for Part B drugs and biologicals is based on standardized billing and payment codes established under the Healthcare Common Procedure Coding System ("HCPCS") assigned to a particular drug or biological or, in the case of multiple source drugs, a group of drugs assigned to the same HCPCS code. *See* 42 C.F.R. § 414.904(b)(1).

55.     By law, Medicare's base reimbursement rate for most Part B drugs and biologicals is set at 106% of the ASP for each HCPCS code. 42 U.S.C. § 1395w-3a(b)(1), (b)(8).

56.     Consistent with the statute, regulations promulgated by CMS set reimbursement for most Part B covered drugs and biologicals at the product's ASP plus 6 percent. *See* 42 C.F.R. § 414.904. This percentage-based markup helps ensure that the Medicare reimbursement rate covers the provider's costs of acquiring and administering these drugs and biologicals.

57.     Variations from that base rate have, until the MFN Rule, likewise been set by statute. *See, e.g.*, 42 U.S.C. § 1395w-3a(c)(4) (providing for reimbursement to providers based on the wholesale acquisition cost of a drug or biological during an initial period in which data on sales prices are not sufficiently available to compute an ASP for the drug or biological); 42 U.S.C. § 1395u(o)(1)(A), (D), (E) (providing for reimbursement based on 95 percent of the average wholesale price for vaccines, certain infusion drugs or biologicals furnished through an item of durable medical equipment, and blood and blood products).

58.     At present, the Budget Control Act of 2011 ("BCA") requires the annual sequester of nonexempt mandatory federal spending programs, including Medicare. Pursuant to this sequestration requirement, Medicare benefit payments are subject to a 2 percent annual reduction. *See* Budget Control Act of 2011, Pub. L. No. 112-25, § 365, 125 Stat. 240, 256 (2011); *see also* Coronavirus Aid, Relief, and Economic Sec. Act, Pub. L. No. 116-136, § 3709, 134 Stat 281, 421 (2020) (extending Medicare payment reductions through fiscal year 2030).

59.     Pursuant to that statutory sequestration requirement, reimbursement for most Part B covered drugs and biologicals is currently reduced from the baseline reimbursement formula of ASP plus 6 percent to ASP plus 4.3 percent. *See, e.g.*, Medicare Payment Advisory Comm'n, *Report to the Congress: Medicare and the Health Care Delivery Sys.* at 80 n.27 (June 2015), https://tinyurl.com/y4ltu5r4.

60.     No provision of the statute creates a "most-favored-nation" price for Medicare drug reimbursement.

### HHS' Limited Statutory Authority to Test Innovative Payment and Service Delivery Models Through the Center for Medicare and Medicaid Innovation

61.     HHS issued the MFN Rule pursuant to a provision of the Affordable Care Act that established CMMI within CMS. *See* Patient Protection and Affordable Care Act. Pub. L. No. 111-

148, § 3021, 124 Stat. 119, 389 (2010) (codified at 42 U.S.C. § 1315a). The purpose of CMMI is to "test innovative payment and service delivery models to reduce program expenditures under [Medicare and/or Medicaid] while preserving or enhancing the quality of care furnished to individuals under such subchapters." 42 U.S.C. § 1315a(a)(1).[29]

62.     Under this provision, HHS has limited authority to waive or amend certain Medicare provisions "solely" for purpose of running "tests" on "payment and service delivery models." 42 U.S.C. § 1315a(b)(1). The results of Phase I tests must be evaluated and, if certain requirements are satisfied, the duration and scope of such "tests" can be expanded to Phase II through rulemaking. *Id.* § 1315a(b)(4)(A), § 1315a(c). Only Phase II tests may be conducted on a nationwide basis, and only after appropriate rulemaking. *Id.* § 1315a(c). The results of such tests must next be reported to Congress, which can then consider the Secretary's recommendations to enact any successful models into law. *Id.* § 1315a(g).

63.     Not every change to Medicare is a "model" under the statute. In particular, a model may be tested only if "there is evidence that [it] *addresses a defined population* for which there are deficits in care." *Id.* § 1315a(b)(2)(A) (emphasis added). Further, HHS is required to "focus on models expected to reduce program costs under the applicable subchapter while *preserving or enhancing the quality of care* received by individuals receiving benefits under such subchapter." *Id.* (emphasis added).

64.     The statute sets forth 27 examples of "models"—not one of which addresses the pricing of, or reimbursement for, prescription drugs. *See id.* § 1315a(b)(2)(B).

65.     In addition, models may only be tested (and potentially adopted more broadly) according to a two-step statutory procedure.

66.     "Phase I" is the "testing" phase. *See id.* § 1315a(b). During testing, the Secretary must "conduct an evaluation of each model tested" that includes an analysis of "the quality of care

---

[29] The Administration contends that Affordable Care Act is unconstitutional and that none of its provisions are severable. In a suit currently pending before the United States Supreme Court, the Administration is asking the Court to strike down the statute in its entirety. *See California v. Texas*, No. 19-840; *Texas v. California*, No. 19-1019 (argued Nov. 10, 2020). Nonetheless, HHS asserts that the MFN Rule is an exercise of CMMI's authority granted by the Affordable Care Act. *See* MFN Rule 42 C.F.R. § 513.1(a), 85 Fed. Reg. at 76,180.

furnished under the model, including the measurement of patient-level outcomes and patient-centeredness criteria determined appropriate by the Secretary; and . . . changes in spending under the applicable subchapters by reason of the model." *Id.* § 1315a(b)(4).

67.     Only upon completing Phase I testing, and "[t]aking into account the evaluation" described above, may the Secretary in "Phase II" "expand" a model's "duration" and "scope"—including by "implement[ing] [it] on a nationwide basis" through "rulemaking." *Id.* § 1315a(c).

68.     Before expanding any model, the Secretary must determine that such expansion is expected to "reduce spending . . . without reducing the quality of care," or "improve the quality of patient care without increasing spending." *Id.* The Secretary must also determine that the expansion "would not deny or limit the coverage or provision of benefits . . . for applicable individuals" and, in identifying models to expand, "shall focus on models . . . that improve the quality of patient care and reduce spending." *Id.*

69.     At least once a year, the Secretary is required to report to Congress on Phase I testing, and this report must "includ[e] the number of individuals . . . participating in [the Phase I] models," as well as a list of models chosen for expansion under Phase II. *Id.* § 1315(g). "[E]ach such report shall provide such recommendations as the Secretary determines are appropriate for legislative action to facilitate the development and expansion of successful payment models." *Id.*

70.     In addition, 42 U.S.C. § 18114 provides that, "[n]otwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that," among other things, "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;" "impedes timely access to health care services;" or "limits the availability of health care treatment for the full duration of a patient's medical needs." CMMI has no authority to waive this "Access to Therapy" provision.

71.     42 U.S.C. § 1315a(d)(2) provides that "there shall be no administrative or judicial review . . . of six specified aspects of testing models:

> (A) the selection of models for testing or expansion under this section; (B) the selection of organizations, sites, or participants to test those models selected; (C) the elements, parameters, scope, and duration of such models for testing or dissemination; (D) determinations regarding budget neutrality under subsection (b)(3); (E) the termination

or modification of the design and implementation of a model under subsection (b)(3)(B); and (F) determinations about expansion of the duration and scope of a model under subsection (c), including the determination that a model is not expected to meet criteria described in paragraph (1) or (2) of such subsection.

42 U.S.C. § 1315a(d)(2)(A)–(F). The statute does not otherwise bar judicial review of HHS actions purportedly taken under § 1315a, including claims that HHS actions are *ultra vires*, unconstitutional, or failed to adhere to notice-and-comment requirements, such as the challenges at issue here.

### *The Most-Favored Nation Rule Is Not An Authorized Test*

72.     On November 27, 2020, CMS and HHS promulgated the MFN Rule as an interim final rule with immediate effect.

73.     The MFN Rule purports to "test" a "payment model" under section 1115A of the Social Security Act, 42 U.S.C. § 1315a.

74.     The true purpose of the Rule, however, is clear on its face: to implement President Trump's policy—which Congress refused to enact—tying the Medicare reimbursement rates for Part B drugs or biologicals to "the most-favored-nation price." Exec. Order No. 13,948, 85 Fed. Reg. 59,649, at § 2(a) (Sept. 13, 2020); *see* 85 Fed. Reg. at 76,182 ("*In response to the September 13, 2020 Executive Order*, we will implement the MFN Model described in this" rule (emphasis added)).

75.     The substance of the MFN Rule likewise demonstrates that it is not a "test" within CMS' limited testing authority. The Rule applies nationwide for seven years, and includes no control group. It is mandatory for all providers who bill Medicare for separately payable Part B medicines, with limited exceptions. And the products it covers account for approximately 75 percent of Part B's expenditures on separately payable drugs and biologicals. 85 Fed. Reg. at 76,193. The point of the MFN Rule, in other words, is to implement a wholly new policy nationwide, across nearly all of Medicare Part B and in contradiction of the statutory framework for Medicare Part B—not to "test [an] innovative payment and service delivery model[]."

76.     Providers who dispense drugs subject to the MFN Rule are not reimbursed based on the mandatory statutory rate set by Congress of ASP plus 6 percent. Instead, the Rule states that providers will receive an "MFN Drug Payment Amount" plus a flat "Alternative Add-On Payment." 42 C.F.R. § 513.210(a).

77.     The MFN Drug Payment Amount—which the MFN imposes to replace the statutory provision requiring reliance on ASP—is based on the "MFN Price." The MFN Price is to be derived quarterly, for each individual drug "from the lowest GDP-adjusted country level price" prevailing among the specified countries. *See* 85 Fed. Reg. at 76,196; 42 C.F.R. §§ 513.140(b)(1), 513.210.

78.     Subject to certain limitations, the MFN Drug Payment Amount will be 75% ASP and 25% MFN Price in the first year, 50% ASP and 50% MFN Price in the second year, 25% ASP and 75% MFN Price in the third year, and 100% MFN Price in all subsequent years. 42 C.F.R. § 513.210(b)(8).

79.     The Alternative Add-On Payment—which replaces the statutory 6 percent of ASP required by Congress—is a flat payment per dose, calculated as 6.1224 percent of a volume-weighted average of historical ASPs for the group of 50 drugs initially subject to the MFN Rule. *See* 42 C.F.R. § 513.220.

80.     Far from establishing a limited "test" of this payment model, the MFN Rule provides that it will apply in "all states and U.S. territories." 42 C.F.R. § 513.220. The Rule likewise applies to all Part B patients who have Medicare as their primary payer and are not covered by other group health plans, 42 C.F.R. §§ 513.2 (defining "MFN Beneficiary"), 513.210(a) (providing that the Rule determines "[t]he total allowed payment amount for an MFN Model drug furnished to an MFN beneficiary by an MFN participant"). Participation in the purported "model" is also mandatory for all Part B health care providers, with few exceptions, *see* 42 C.F.R. §§ 513.100(b) (providing as default that "the MFN Model requires participation by each Medicare participating provider . . . that submits a claim" covered by the Rule); 513.100(c) (excluding only certain specialized providers and certain providers in underserved areas).

81.     Moreover, the MFN Rule applies (with certain exclusions, *see* 42 C.F.R. § 513.130(b)) to the "top" Part B drugs, starting with the 50 for which Medicare paid the most money in 2019.[30] Drugs that enter the top 50 and do not fall within an exclusion will be added to the list on a yearly basis. 42 C.F.R. § 513.130(a)(2). Drugs are removed from the list, however, only if

---

[30] Fact Sheet: Most Favored Nation Model for Medicare Part B Drugs and Biologicals Interim Final Rule with Comment Period, https://tinyurl.com/y65f3qr6; *see also* 42 C.F.R. § 513.130(a)(1).

they are removed from the market (or otherwise terminated from CMS's coding system) altogether. 42 C.F.R. § 513.130(a)(3). Thus, over time, even more drugs will be subject to the Rule, expanding the program even further beyond what a true "model" might be.

82.      The 50 drugs initially included under the MFN Rule "accounted for approximately 75 percent of annual Medicare Part B drug allowed charges for separately payable drugs [in] 2019." 85 Fed. Reg. at 76,193. HHS projects that in each year the Rule is effective, it will cover drugs that "account for roughly 73 percent of Medicare Part B drug spending." *Id.* at 76,238. And the MFN Rule is scheduled to be in effect for seven years. 42 C.F.R. § 513.1(c).

83.      In short, the MFN Rule is far from being a limited "test" designed to provide information to Congress to consider whether a legislative change is warranted, *see supra* ¶ 61. Rather, it is a sweeping national change to Medicare drug pricing policy imposed by the Administration rather than adopted by Congress.

### The MFN Rule Will Have Significantly Adverse Impacts on Patients and Providers

84.      HHS acknowledged that there is no "reliable precedent in the U.S. market" for its model, 85 Fed. Reg. at 76,237, and that it lacked "direct experience with policies such as the MFN Model," *id.* at 76,240.

85.      As a consequence, HHS repeatedly acknowledged that there is "an unusually high degree of uncertainty" about the model's potential impacts. 85 Fed. Reg. at 76,237; *see also id.* at 76,181, 76,230, 76,238, 76,240, 76,243–44, 76,246. Given that uncertainty, HHS candidly acknowledged that the MFN Rule might adversely affect health care providers and Medicare Part B beneficiaries, and that it was "unable to quantify these potential effects of the MFN Model." *Id.* at 76,244.

86.      These adverse impacts are significant. As a result of the MFN Rule, some healthcare providers may suffer extreme financial hardship, *id.* at 76,222, or even go out of business. To avoid such harms, providers may decide not to treat their patients with drugs covered by the MFN Rule and prescribe alternative therapies instead. *Id.* at 76,243–34. In turn, Medicare beneficiaries may suffer "access to care impacts by having to find alternative care providers locally, having to travel to

seek care from an excluded provider, receiving an alternative therapy that may have lower efficacy or greater risks, or postponing or forgoing treatment" altogether. *Id*. at 76,244. HHS further admits that there is "significant uncertainty with these potential effects," *id.*, and one study it relies on estimates that, within three years, nearly one in five Medicare patients will have *no* access to drugs covered by the MFN Rule. *Id.* at 76,237–38.

### The MFN Rule Was Issued Without Notice or an Opportunity to Comment

87.     Despite all of the foregoing uncertainties and potential harms, HHS issued the MFN Rule without prior notice or opportunity for affected parties to comment. Instead, although HHS provided a 60-day period for stakeholders to comment on the MFN Rule, it designated the MFN Rule as an "interim final rule" that is effective immediately and will start altering reimbursement rates on January 1, 2021—*before* the agency will even receive, much less have an opportunity to consider, the comments it has requested. That action clearly violates the APA and the Medicare Act.

88.     Over two years ago, HHS issued an Advance Notice of Proposed Rulemaking in 2018 ("2018 ANPRM") that discussed an "international price index" model ("IPI Model"). *See* Medicare Program; Int'l Pricing Index Model for Medicare Part B Drugs, 83 Fed. Reg. 54,546 (Oct. 30, 2018).

89.     HHS made clear that this "advance" notice was part of its "ongoing work" to develop the IPI Model, which was merely a "potential model" at the "concept design" stage. *Id*. at 54,547–50. Indeed, HHS noted that the 2018 ANPRM was intended as a "general solicitation of comments on several options" and thus "not subject to OMB review." *Id*. at 54,561. The Advance Notice further stated that additional comments on the model design would be invited "through notice and comment rulemaking," *id*. at 54,550, at which time interested parties would also have an opportunity to comment on any information collection requirements "through subsequent proposed and final rulemaking documents." *Id*. at 54,561.

90.     The 2018 ANPRM outlined a plan to potentially test a single IPI Model with three components.

91.     First, HHS would "contract[] with a number of private-sector vendors that would supply [providers] with the drugs and biologicals that [HHS] would include in the [IPI Model] in all

of the model's selected geographic areas." *Id.* at 54,550. These "model vendors" would purchase model drugs from manufacturers at a negotiated price, and arrange for their distribution to providers and billing to Medicare. *Id.* Under that arrangement, "the model vendors, rather than the health care providers, would take on the financial risk of acquiring the drugs and billing Medicare." *Id.*

92.     Second, Medicare would pay model vendors for each model drug based on a formula indexed to the average price of the drug across 14 countries—Austria, Belgium, Canada, Czech Republic, Denmark, Finland, France, Germany, Greece Ireland, Italy, Japan, Netherlands, and the United Kingdom. *Id.* at 54,557.

93.     Third, Medicare would shift the calculation of the add-on payment to Part B providers from 6 percent of the prescribed drug's ASP, to a "set payment amount per encounter or per month . . . for an administered drug, which would not vary based on the model payment for the drug itself." *Id.* at 54,553.

94.     The 2018 ANPRM proposed conducting a randomized test of the IPI Model across "geographic units." *Id.* at 54,553. Under the proposed test, providers "in selected geographic areas" would be required to participate in the model. *Id* at 54,552–53. Participants would be required to purchase model drugs from at least one model vendor. *Id.* at 54,552. "Outside of the designated model test areas and for drugs not included in the model, health care providers would continue" under Medicare's ordinary payment policies. *Id.* at 54,550. The 2018 ANPRM advised that the geographic areas included in the model "would include 50 percent of Medicare Part B spending on separately payable Part B drugs." *Id.* at 54,553.

95.     The MFN Rule differs in numerous critical respects from the IPI Model discussed in the 2018 ANPRM. Among other things:

96.     The 2018 ANPRM provided no indication that HHS was considering any test of a model in which Part B reimbursement rates would be based upon the *lowest* price prevailing in any one of numerous countries. Rather, the 2018 ANPRM proposed that Part B payments would be indexed to a drug's *average* international price, multiplied by a CMS-selected factor to obtain an intermediate "Target Price" calibrated to achieve "about a 30 percent reduction in Medicare spending for included Part B drugs over time." *Id.* at 54,556. Use of a "most favored nation"

approach raises numerous serious issues. For example, it creates the possibility that reimbursement rates will be set based on a single "outlier" country (where, for instance, a drug has no patent protection). As a result, President Trump estimated that the final MFN Rule would lead to a reduction of reimbursement rates as much as "80 percent" to "90 percent."[31] And implementing a "most favored nation" approach also requires the creation of a complex framework for determining which country actually has the "lowest" prices for a "drug."

97.     The 2018 ANPRM proposed "a randomized [test] design with the randomization to [model] and [control] groups occurring at the geographic unit of analysis." *Id.* at 54,553. HHS specifically sought comment on the size of the geographic areas it should evaluate, and whether any geographic adjustments or exclusions would be appropriate. *Id.* at 54,554. It gave no indication, in other words, that a *nationwide* "test" was under consideration. Nor did it give any indication that it planned to conduct a test without randomization and comparison between model and control groups, and instead would use the no-control "interrupted time series" approach asserted in the MFN Rule. *See id.* at 54,553.

98.     The MFN Rule does not include the "model vendors" that were integral to the 2018 ANPRM. Without such vendors, manufacturers and healthcare providers have no intermediary in place to take on the financial risk between the acquisition price of the drug and the MFN reimbursement rate. This is particularly problematic given that most manufacturers do not sell drugs directly to healthcare providers, and consequently do not have visibility into whether a particular sale was made to a Medicare patient or to a patient with private insurance. The MFN Rule therefore requires healthcare providers to assume the financial risk that Medicare reimbursements to them for the drugs they use in their treatment of their patients will be far lower than the sales price the providers paid, which in turn will impact the healthcare providers' financial ability to purchase the covered drugs. This risk poses a tremendous threat to patient's access to the drugs. And it stands in stark contrast to the 2018 ANPRM, in which "the model vendors, rather than the health care providers, would take on the financial risk." *Id.* at 54,550.

---

[31] Remarks by President Trump at Signing of Executive Orders on Lowering Drug Prices, The White House (July 24, 2020 from 3:45 PM ET to 4:28 PM ET), https://tinyurl.com/yxa89x9k.

99.     Stakeholders were not afforded an opportunity to comment on these or any of the other provisions of the MFN Rule before it became effective. HHS' failure to provide such an opportunity plainly violates the requirements of the APA, but its violation is particularly significant here, where HHS admits that there is no "reliable precedent in the U.S. market" for the MFN Rule, and "an unusually high degree of uncertainty" about its potential impacts. 85 Fed. Reg. at 76,237.

100.     In addition, in issuing the MFN Rule, HHS relied on two new studies estimating the Rule's impact, but HHS again gave the Rule immediate effect before stakeholders could comment on these studies. Among other flaws, one of the studies assumes that healthcare providers will accept reduced revenue or find alternative, effective Part B treatments when that may not be possible; it assumes that alternative products are available but acknowledges that additional burdens on patients are likely to result and does not quantify the impacts; and it acknowledges that there may be negative spillover effects in the non-Medicare market, but does not quantify this potential impact. *Id.* at 76,240–41, 76,243. HHS thus gave immediate effect to the MFN Rule without allowing stakeholders to comment on the flaws in the studies HHS relied on in adopting that Rule.

101.     Further, HHS acknowledges that, as a result of the MFN Rule, some healthcare providers may suffer extreme financial hardship, *id.* at 76,222, and some Medicare patients may receive inferior therapies with "lower efficacy or greater risks," or end up "postponing or forgoing treatment" altogether. *Id.* at 76,244. This is directly contrary to the statutory requirements for any test that CMMI is authorized to pursue under the statutory model provisions. *See* 42 U.S.C. § 1315a. It also is contrary to HHS's obligation to protect patients' access to treatment. 42 U.S.C. § 18114.

102.     And, as noted above, defendants rushed to put the MFN Rule in place before the start of the next Administration without waiting for stakeholders to comment on the many potential adverse impacts that the Rule could have on patients, health care providers, and manufacturers.

### *HHS Lacked The "Good Cause" Required by Statute to Make the MFN Rule Immediately Effective*

103.     The MFN Rule states that there is "good cause" to dispense with the required notice and comment. *See* 85 Fed. Reg. at 76,249–50. HHS asserts "that the increases in Part B premiums and deductibles was largely due to rising spending on physician-administered drugs," that such price

increases could lead to "improper medication adherence or skipped treatment," and that the economic disruptions caused by the COVID-19 pandemic, including supposedly "historic levels of unemployment," "exacerbate[s]" these problems. *Id.* at 76,249. This rationale is baseless and thus does not satisfy the statutory good cause requirements. 5 U.S.C. § 553(b)(B); *see also* 42 U.S.C. § 1395hh(b)(2)(C).

104.     First, the MFN Rule is plainly not a response to new emergency conditions. To the contrary, the Administration has long been pursuing action on drug pricing, and has been discussing its intention to alter the reimbursement formula for Medicare Part B drugs for over two years—before the pandemic even began. *See supra* at ¶¶ 26–43. Indeed, in the numerous statements the President and Administration made about its MFN policy from July 2020 until the MFN Rule was announced on November 20th, the COVID-19 pandemic was not mentioned, even though it had been raging for months. Furthermore, the MFN Rule includes no explanation as to why a proposed rule could not have been released during this period. If a proposed rule had been released in July, when the President first signed an Executive Order on the subject, there would have been time for notice-and-comment proceedings in the four months before the final rule was released in November. The agency's delay in issuing a proposed rule does not provide a valid basis for dispensing with the APA's notice and comment requirements.

105.     Second, the MFN Rule expressly *excludes* all drugs authorized "to treat patients with suspected or confirmed COVID-19," 42 C.F.R. § 513.130(b)(ix), on the ground that applying the "MFN Model" to COVID-19 drugs would impair the "rapid, widespread availability of such drugs in the U.S." 85 Fed. Reg. at 76,191. Thus, the fact that adults 65 or older comprise 8 out of 10 U.S. deaths from COVID-19, *id.* at 76,249, does not explain why it is necessary to rush implementation of a rule that will alter reimbursement rates for Medicare Part B drugs that are *not* used to treat COVID-19.

106.     Third, there is no basis for claiming that the MFN Rule must take immediate effect in order to address a sudden rise in spending on Part B medications. Instead, according to CMS's own data, a comparison of the first quarter 2019 payment amount with the last quarter of 2018 reveals that, on average, there was no change in payment amounts for the top 50 Part B drugs, and more

1    recent quarter-to-quarter comparisons showed that, on average, payment amounts *decreased* from

2    0.4 percent to 3.2 percent for the top 50 drugs. CMS, 2020 ASP Drug Pricing Files (last modified

3    Nov. 13, 2020), https://tinyurl.com/sp78dv6; CMS, 2019 ASP Drug Pricing Files (last modified June

4    1, 2020), https://tinyurl.com/y4dz5zwu.

5        107.    Fourth, HHS asserts that immediate action is warranted because the pandemic has

6    caused "historic levels of unemployment," and "we are currently seeing a new surge in COVID-19

7    cases *that may lead* to additional hardship and requires immediate action." 85 Fed. Reg. at 76,249

8    (emphasis added). But, as of November 2020, the "seasonally adjusted" civilian unemployment rate

9    was 6.7%, which is not historically high. Civilian Unemployment Rate, Graphics for Economic

10   News Releases, U.S. Bureau of Labor Statistics (last updated November 2020),

11   https://tinyurl.com/hnbvbpy. In fact, HHS acknowledges that there have been "positive economic

12   and employment trends since the initial peak in April," 85 Fed. Reg. at 76,249, and the

13   Administration has stated that "our economy is rebounding far beyond any expectations."[32]

14   Moreover, most Medicare beneficiaries are retirees and most have some type of supplemental

15   insurance, meaning that they have secondary insurance that may cover the co-payments for Part B

16   drugs. For instance, in 2016, 81% of Medicare beneficiaries had supplemental insurance either

17   through employer-sponsored insurance (30%), Medigap (29%), or Medicaid (22%).[33] Thus, HHS

18   has failed to identify a rational connection between economic dislocations caused by the COVID-19

19   pandemic and the ability of Medicare beneficiaries to obtain their Part B medications under the ASP

20   reimbursement methodology.

21       108.    Fifth, HHS's assertion that immediate implementation of the MFN Rule will alleviate

22   economic hardships caused by COVID-19 is based on speculation. HHS claims that the MFN model

23   "will provide *immediate relief* to Medicare beneficiaries through reduced copays for MFN drugs due

24   to lower drug payments." *Id.* at 76,249 (emphasis added). But this myopic focus on one impact of

25   [32] Remarks by President Trump During an Update on Operation Warp Speed, The White House
     (Nov. 13, 2020), https://tinyurl.com/yylopdy3. This purported rationale is also contrary to the
26   Administration's many statements that the COVID pandemic has *not* created an emergency
     situation. *See* Juana Summers, *Timeline: How Trump Has Downplayed The Coronavirus Pandemic*,
27   National Public Radio (Oct. 2, 2020), https://tinyurl.com/y32uoas7.
     [33] Kaiser Family Foundation, *Sources of Supplemental Coverage Among Medicare Beneficiaries in*
28   *2016* (Nov. 28. 2018), https://tinyurl.com/yde57hle.

the rule ignores the rule's many other adverse impacts. HHS assumes that reduced copays will ensure that the pandemic does not cause seniors to "stint[] on care," *id.*, but it elsewhere admits that, in its first year of operation, the MFN Rule itself may cause nearly 10% of Medicare beneficiaries to have "no access" to their Medicare Part B drugs, *id.* at 76,237, that the savings HHS projects are "attributable to beneficiaries *not accessing their drugs through the Medicare benefit*," *id.* (emphasis added), and that the "potential loss of access to certain drugs" may cause patients to incur "*additional medical expenses*" overall, *id.* at 76,247 (emphasis added). It also acknowledges that the MFN Rule is unprecedented and there is "an unusually high degree of uncertainty" about the potential impacts of its action. *Id.* at 76,237.

109.    In short, HHS's justification for giving the MFN Rule immediate effect is riddled with inconsistencies that make plain that it is an after-the-fact pretext.

### *Adverse Impact of the Most-Favored Nation Rule on Plaintiffs' Members*

110.    The members of BIO, CLSA, and Biocom include leading biotechnology companies that are dedicated to pursuing groundbreaking science to discover and develop medicines for people with serious and life-threatening illnesses. As research-driven biotechnology companies, these members invest heavily in researching diseases and treatments. They rely on investment and revenue generated through the sale of existing medicines to finance research and development of innovative new medicines. For each successful new drug, there are many drugs that fail during the research and development process, and so the revenues generated from the successful drugs must cover not only the costs for developing that drug, but also the costs of developing products which fail in clinical trials.

111.    Thus, biotechnology innovation relies on the availability of free market incentives and a fair reimbursement formula for innovators and investors as well as for providers and the patients they serve. These incentives have allowed pre-commercial, pre-revenue companies to weather the storm of uncertainty until they can bring a product to market. They have also incentivized companies to make larger investments into their research and development efforts, which, in turn, have allowed them to serve more patients, stimulate job growth and expand access to

1   life saving medicine.

2       112.    If the MFN Rule is implemented, it will have substantial adverse effects on the

3   revenues of plaintiffs' members and other manufacturers of Part B drugs, revenues that they have

4   traditionally invested in research and development, jobs, and manufacturing to bring new medicines

5   to patients.

6       113.    Plaintiffs' members generally do not sell Part B drugs directly to healthcare providers

7   (such as doctors and hospitals), but instead to distributors. Healthcare providers buy drugs from

8   those distributors, use them in their treatment of patients and—for drugs used for Medicare Part B

9   patients—seek reimbursement from Medicare. This is often referred to as the "buy and bill" model

10  for Part B drugs.

11      114.    Healthcare providers generally cannot afford to buy and bill for Part B drugs at a loss,

12  so the price paid by a provider to the distributor for drugs used to treat Medicare beneficiaries cannot

13  generally exceed the reimbursement rate providers will receive from Medicare. In turn, the price

14  paid by a distributor to the manufacturer cannot exceed what healthcare providers are willing to pay

15  to the distributor.

16      115.    Certain drugs are sold in foreign countries at lower prices than in the U.S. due to, a

17  host of reasons, including, among other things, price controls imposed by foreign governments,

18  weaker protections for intellectual property in those countries, differences in demand, or independent

19  decisions by third parties licensed to distribute those drugs overseas. Capping Medicare Part B

20  reimbursement rates at the lowest price paid for the drugs in other countries will therefore force

21  manufacturers such as plaintiffs' members either to reduce U.S. prices below the MFN Rule

22  reimbursement rates, and/or to lose market share as healthcare providers will stop prescribing their

23  drugs because the healthcare providers cannot pay more for the drugs than they will receive in

24  reimbursement from Medicare. Either course of action will impair the manufacturers' revenues and

25  related ability to develop new treatments.

26      116.    Due to the role of distributors in the market, manufacturers and healthcare providers

27  cannot practically respond to the rule by using the MFN price for Medicare Part B sales, while also

28  maintaining the market rate for other sales, particularly given the Rule's immediate effective date.

Distributors do not differentiate the price they will pay to a manufacturer for a drug product based on whether they will ultimately sell the drug to a healthcare provider for treatment of a Medicare patient as opposed to treatment of a privately insured patient. By cutting the Medicare reimbursement rate, the MFN Rule will therefore also change the commercial price that distributors are willing to pay manufacturers for their products.

117.     This problem is rendered particularly acute by the fact that the MFN Rule includes no provision setting up vendors to acquire the price-controlled drugs for the Medicare program. *See* ¶ 98, *supra*. That mechanism, which had been discussed in the International Pricing Index ANPRM two years ago, would have mitigated to some degree the risk of unreimbursed costs that healthcare providers face under the MFN Rule. The lack of a vendor mechanism—combined with the immediate effective date of the Rule—will greatly increase harms to both manufacturers and healthcare providers, as manufacturers will not have time to re-negotiate contracts or otherwise stratify pricing, and as healthcare providers will bear the severe financial risk that Medicare reimbursements will not match the prices they pay for the covered drugs. *Id.*

118.     In addition, the MFN Rule will also likely impact the reimbursement rate paid for the drugs by other programs, such as Medicaid and the 340B programs, as the reimbursement formulas for those programs are determined based on, among other things, the average price paid to the manufacturer by certain customers and the lowest price available to any entity for the drug.

119.     Plaintiffs' members cannot avoid or substantially mitigate these adverse effects by raising the prices at which they sell their products internationally or otherwise. In some countries, drug prices are effectively set by the government or a government-backed healthcare provider. In such countries, the government healthcare monopoly may be unwilling to pay an increased price. In other countries, a drug may have no patent protection due to weaker intellectual property protections in those countries, may have competitors on the market that are not approved in the U.S., or may be sold in that geographic area by a different manufacturer entirely (which would have no incentive to alter its pricing decisions simply to increase the price that would be paid to another manufacturer for that drug in the United States).

120.     Implementation of the MFN Rule will also hamper manufacturers' ability to meet

their statutory obligation to calculate and submit an ASP to CMS, for which there could be a risk of significant penalties. 42 U.S.C. § 1396r–8(b)(3)(A)(iii). The Rule requires that manufacturers exclude from the ASP calculation the units of drugs reimbursed according to the new MFN Rule. But manufacturers—which, again, typically sell their drugs to wholesalers or distributors, which in turn sell those drugs to healthcare providers to use in their treatment of their patients—generally have no way to determine whether a drug purchased from them by a wholesaler or distributor will ultimately be administered by a provider to treat a Medicare patient, rather than a patient with Medicaid or commercial insurance. Indeed, even the wholesaler or distributor would not know when its customer, such as a hospital outpatient department, administers a drug to a Medicare patient as opposed to a Medicaid or a commercially insured patient, let alone how much the customer will be reimbursed. For manufacturers to gain such downstream visibility into precisely who pays for their drugs to treat which patients would require not only that manufacturers transform their price-reporting systems, but also that wholesalers, distributors and others in the drug supply distribution chain cooperate closely with manufacturers' efforts in this regard—likely incurring considerable expense in the process. Even if such a transformation were possible, it could not be effected for the 50 selected drugs in the MFN Rule in the scant five weeks provided before the Rule goes into effect.

121. The MFN Rule will also threaten the financial viability of some specialty practices by reducing the reimbursement rate for the drugs subject to the MFN Rule to below the acquisition cost. As discussed, Congress has fixed reimbursement rates at 6 (now at the sequestered 4.3) percent over ASP. The MFN Rule would replace that percentage-based markup with a flat fee. 42 C.F.R. § 513.220. The likely effect of the MFN Rule is that such providers will cease administering those products which would be administered at a financial loss to the practice, which in turn will result in lost revenue (as a result of the loss of patients whom the practice will no longer serve), and which could result in some clinics being forced to close. In turn, such impacts on providers would both make it more difficult or impossible for patients to obtain drugs subject to the MFN Rule and would cost manufacturers revenues associated with the sale of drugs to those clinics. Thus, the MFN Rule, particularly given its immediate effective date and lack of notice-and-comment process, will cause unavoidable and irreparable harm to manufacturers, healthcare providers, and patients.

122.     Finally, as plaintiffs explain next, implementation of the MFN Rule will also significantly undermine the research and development efforts of their members.

### The MFN Rule Will Severely Limit Drug Innovation and Patient Access

123.     The market-based system that Congress enacted for calculating Medicare reimbursement rates for Part B and other Medicare-covered drugs ensures that more and newer medicines are available sooner to Americans, with better health outcomes for those with serious diseases. "Of the 74 cancer drugs launched between 2011 and 2018 worldwide, 95% are available in the United States, whereas only 74% are available in the United Kingdom, 49% in Japan, and 8% in Greece." *Importing International Reference Pricing in the U.S. Jeopardizes Patient Access to Innovative Medicines*, BIO, https://www.bio.org/save-cures (last accessed Dec. 4, 2020). Similarly, "[n]early 90% of all new medicines launched since 2011 are available in the United States, compared to 50% in France, 48% in Switzerland, and 46% in Canada." *Id.* Many of the drugs manufactured by BIO's and CLSA's and Biocom's members are not available in many European countries with price controls.

124.     Price controls undermine the ability of companies to develop new medicines by depriving them of funds necessary to do so. In the United States, investors receive a market-based return on their investment, which is limited by the market value of the few products that ultimately make it to market and are successful. Free markets spur investment in discovery, which, in turn, benefits the public in the form of innovations that lead to trials and ultimately valuable new treatments and cures for diseases. In a jurisdiction that employs price caps on prescription drugs, by contrast, the potential return on investment is sharply limited.

125.     These effects are well recognized. Indeed, in 2018, during a hearing before the Senate Health Committee, HHS Secretary Azar testified that he did not believe a "most-favored-nation" plan would be effective, because this type of plan could reduce the availability of drugs, as has happened in other countries that set a "reference price." Prescription Drug Pricing at 01:03:13, C-SPAN (June 12, 2018), https://tinyurl.com/y5a8yjsh. The Administration itself opposed one bill that aimed to cap prescription drug prices based on the average price in certain foreign countries, on the

30

1   ground that it would "compromise the health of Americans by dramatically reducing the incentive to

2   bring innovative therapeutics to market." Executive Office of the President, Statement of

3   Administration Policy: *H.R. 3 – The Elijah E. Cummings Lower Drug Costs Now Act*, The White

4   House (Dec. 10, 2019), https://tinyurl.com/yye73sa9; *see also* H.R. 3, 116th Cong. (2019),

5   https://tinyurl.com/y23bfxva. Members of Congress have agreed that a "most-favored-nations"

6   approach to drug pricing would not "be to the benefit of the adoption of and research for modern

7   drugs." Peter Sullivan, *Grassley Announces Opposition to Key Trump Proposal to Lower Drug*

8   *Prices*, The Hill (June 19, 2019 at 3:19 PM ET), https://tinyurl.com/yyozvjrh.

9       126.    The MFN Rule will deprive emerging biotechnology companies of their ability to

10  attract crucial financing by seriously impacting their potential for market-based returns if the product

11  is a success. As discussed above, the MFN Rule will cause pharmaceutical manufacturers to lose

12  market share and/or to lower prices to avoid such losses. Either way, the MFN Rule reduces

13  revenues, thereby limiting the return on investment in biopharmaceuticals. In an industry in which

14  the success rate on research and development efforts is so low, the MFN Rule will impair the ability

15  of companies to obtain financing. *Cf.* Ernst & Young, *Biotechnology Report 2017: Beyond Borders-*

16  *Staying the Course* 18–19 (2017) (noting challenges in obtaining investment due to R&D costs and

17  the need for the biotechnology industry to improve its return-on-investment),

18  https://tinyurl.com/y2ckrhcu.

19      127.    The biotechnology "industry relies heavily on private investments to fund research,

20  and investors are clearly uncomfortable with the prospect of price controls, direct or indirect.

21  Decreases in investor confidence can only result in a decrease in investment dollars, thereby placing

22  critical research at risk. In addition, biopharmaceutical price controls will inevitably, and perhaps

23  irreparably, damage the financial health of these dynamic companies and the hundreds of thousands

24  of citizens they employ." Letter from Alfred R. Berkeley III, President, NASDAQ, to Hon. Dennis J.

25  Hastert, Speaker, U.S. House of Representatives (May 16, 2000) (on file with BIO); E&Y

26  Biotechnology Report, *supra*, at 56 ("The November US election kept a lid on 2016 biotech

27  financing, as capital became scarce amid discussion of drug price controls . . . .").

28      128.    From 2000 to 2010, the U.S. was responsible for 57% of new medicine development

globally, whereas countries with price controls (France, Germany, Japan, and the United Kingdom), were responsible for only 29% of "new chemical entities developed[.]" Robert D. Atkinson, *Why Life-Sciences Innovation Is Politically 'Purple'—and How Partisans Get It Wrong*, Info. Techn. & Innovation Found. (Feb. 2016), https://tinyurl.com/yyup8nhg. These pricing controls are why Europe no longer leads the world in biopharmaceutical R&D. Joseph H. Golec & John A. Vernon, *European Pharmaceutical Price Regulation, Firm Profitability, and R&D Spending* (NBER Working Paper 12676) (Aug. 2006) ("In 1986, EU pharmaceutical R&D exceeded U.S. R&D by about 24 percent, but by 2004, EU R&D trailed U.S. R&D by about 15 percent."), https://tinyurl.com/y6pnjml4.

129.    Economists have warned that, if foreign price controls had been adopted in the United States from 1986-2004, there would have been 117 fewer new medicines produced for worldwide use and 4,368 fewer research jobs in the United States. And a 2018 study by researchers with Precision Health Economics found that, if price controls had been eliminated in OECD countries, that would lead to a 9-12% increase in research by 2030 and the development of 13 more new drugs per year. Taylor T. Schwartz, MPH, et al., *The Impacts of Lifting Government Price Controls on Global Pharmaceutical Innovation and Population Health* (2018), https://tinyurl.com/y24x97gz.

130.    A report published by the Brookings Institute estimated that, if European drug prices were increased by 20%, it "would result in substantially more drug discovery worldwide" and that, "such a European price increase would lead to $10 trillion in welfare gains for Americans over the next 50 years." Dana Goldman & Darius Lakdawalla, *The Global Burden of Medical Innovation*, Brookings (Jan. 30, 2018), https://tinyurl.com/y9893bsn.

131.    The discrepancy in investment has resulted in a decrease in innovation. One study has indicated that, while EU consumers paid less for pharmaceuticals, these price controls resulted in "about $5 billion in foregone R&D spending, 1680 fewer research jobs and 46 foregone new medicines." Golec & Vernon, *supra*, at 6.

132.    In the last thirty years, biotechnology research has yielded treatments for medical conditions including osteoporosis, heart attack, stroke, hemophilia, HIV/AIDS, chronic renal failure, multiple sclerosis, hepatitis, arthritis, anemia, pneumonia, infertility, attention deficit hyperactivity

disorder, migraine, diabetes, HPV, and multiple forms of cancer. The U.S. Chamber of Commerce described the biotechnology industry as the area with the greatest promise and potential. U.S. Dep't of Commerce, *A Survey of the Use of Biotechnology in U.S. Industry* vii (Nov. 2003), https://tinyurl.com/y2bosxwn.

133.     However, this progress will stall without adequate investment into research and development. Currently, biotechnology "is one of the most research-intensive industries in the world." *Biotechnology Industry Facts*, Bioprocess Online (Apr. 2, 2007), https://tinyurl.com/y59cyldr. For example, in 2016, "biopharmaceutical companies alone accounted for 52.3% of total [United States] R&D spending" Kelly Davio, *Report: US Medical Health Research Spending on the Rise, But for How Long?*, AJMC (Nov. 15, 2017), https://tinyurl.com/yyug9c6e.

134.     The investment that a company makes to develop even a single therapy is enormous. The average cost of developing a therapy is approximately $2.6 billion, and development takes 10-12 years. Policy & Medicine, *A Tough Road: Cost To Develop One New Drug Is $2.6 Billion; Approval Rate for Drugs Entering Clinical Development is Less Than 12%* (Mar. 21, 2019), https://tinyurl.com/s7bwq4a. The chances that a biopharmaceutical will achieve FDA approval is "estimated to be less than 12%." Biopharmaceutical Research & Development, The Process Behind New Medicines, PhRMA (2015), https://tinyurl.com/yxn3er4y. Of those therapies that do reach market, less than 10% of all U.S. biopharmaceutical companies make a profit selling brand name prescription drugs. *Importing International Reference Pricing in the U.S. Jeopardizes Patient Access to Innovative Medicines*, BIO, https://www.bio.org/save-cures (last accessed Dec. 4, 2020).

135.     Importing foreign price controls into the U.S. market will have a particularly negative effect on the ability to develop new drugs to treat rare diseases and diseases for which drug discovery is especially difficult, including diseases such cancer and Alzheimer's, which have some of the lowest clinical trial success rates. The MFN Rule could make it no longer economically feasible to pursue approval for some new drugs, or to conduct research into whether existing drugs can be used to treat additional conditions. The Rule could therefore dramatically reshape clinical pipelines and future medicines available for patients with devastating conditions. Such changes will

be immediate and irreversible because research projects abandoned while awaiting resolution of this and other challenges to the MFN Rule may be restarted only years later, significantly slowing the entry of new drugs into the market.

136.      The MFN Rule would hamstring the biotechnology industry as it currently exists, causing innovator firms to curb research and development efforts and reduce manufacturing capacity.

137.      It is particularly ironic that HHS is invoking the COVID-19 pandemic as a basis for giving immediate effect to a Rule that will impair the current efforts of plaintiffs' members to respond to the COVID-19 pandemic. Plaintiffs' members are working to develop over 700 unique therapies to treat patients with COVID-19 related symptoms. *BIO COVID-19 Therapeutic Development Tracker,* BIO, https://tinyurl.com/y948pgu4 (last updated Nov. 23, 2020 at 2:26 PM). Plaintiffs' members have also adjusted their manufacturing facilities to ensure that they can meet potentially increased demand for medicines that may be effective against COVID-19, at substantial cost and disruption. Even though COVID-19 drugs have themselves been excluded from the MFN Rule, by substantially reducing revenues from sales of their existing medicines, implementation of the MFN Rule would make it difficult, and potentially impossible, for Plaintiffs' members to maintain their current support for these COVID-19 related research and development initiatives, including potentially forcing them to cancel or postpone clinical trials for potential COVID-19 treatments.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

***(Declaratory/Injunctive Relief – Defendants Issued the MFN Rule Without the Requisite Notice and Comment in Violation of the APA and the Medicare Act)***

138.      The prior paragraphs of the Complaint are incorporated by reference.

139.      The Administrative Procedure Act requires federal agencies to provide public notice of rule changes and an opportunity for comment, unless they "for good cause find[] . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B); *see also* 42 U.S.C. § 1395hh (heightened notice-and-comment requirements for

1    regulations issued under the Medicare Act).

2    140.    The APA also requires federal agencies to provide a minimum 30 days' notice before

3    any substantive rule becomes effective, unless "otherwise provided by the agency for good cause

4    found and published with the rule." 5 U.S.C. § 553(d)(3); *see also* 42 U.S.C. § 1395hh(e)(1)(B)(ii)

5    (30-day period required for regulations under the Medicare Act unless the Secretary finds that

6    waiver is "necessary to comply with statutory requirements" or where "application of such 30-day

7    period is contrary to the public interest").

8    141.    The MFN Rule was issued without prior public notice or an opportunity for comment,

9    and without the statutorily required "good cause" to dispense with the notice-and-comment process.

10    142.    The notice-and-comment requirements are an integral part of agency rulemaking, and

11    particularly so where changes to payments under the Medicare Act are concerned. *See Azar v. Allina*

12    *Health Servs.*, 139 S. Ct. 1804, 1809 (2019) ("Congress . . . decided that, with the growing scope of

13    Medicare, notice and comment should become a matter not merely of administrative grace, but of

14    statutory duty.").

15    143.    Federal agencies may bypass the notice-and-comment requirements only "for good

16    cause shown." 5 U.S.C. § 553(b)(B), (d)(3); *see also* 42 U.S.C. § 1395hh(b)(2)(C). Defendants have

17    failed to satisfy this exception, which is "narrowly construed and only reluctantly countenanced."

18    *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quoting *Alcaraz v. Block*, 746 F.2d 593, 612

19    (9th Cir. 1984)), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v.*

20    *California*, 139 S. Ct. 2716 (2019).

21    144.    The MFN Rule was issued on November 27, 2020, as an interim final rule with

22    immediate effect.

23    145.    HHS admits that it has not satisfied the notice-and-comment requirements of 5 U.S.C.

24    § 553(b)(B) or (d)(3). HHS gave the MFN Rule immediate effect, and the Rule will begin to alter the

25    Part B reimbursement rates on January 1, 2021, *before* stakeholders can comment on a wide range of

26    important issues, including, among other things, deficiencies in the studies that HHS relied on in

27    issuing the MFN Rule; serious implementation problems, including with respect to price reporting

28    and reimbursement determinations; and the very significant adverse impacts the MFN Rule will have

on Medicare patients, Medicare providers, and the manufacturers of Medicare Part B drugs. *Supra* ¶¶ 99–103.

146.    HHS's assertion that there is "good cause" for dispensing with those requirements here lacks merit. 85 Fed. Reg. at 76,248–50. It contends that the pandemic requires immediate emergency measures. But, for the reasons explained above, the agency's explanation is riddled with inconsistencies and invalid. *Supra* ¶¶ 103, 141–45. Indeed, this Court recently held that the economic impacts of the pandemic did not provide "good cause" to dispense with notice-and-comment proceedings for another rule, explaining that "the emergent nature of the COVID-19 pandemic writ large" could not justify such measures in the absence of an adequate showing "that the impact of the COVID-19 pandemic on domestic [economic conditions] justified dispensing with the 'due deliberation' that normally accompanies rulemaking to make changes to [an agency] program that even Defendants acknowledge are significant." *Chamber of Commerce,* 2020 WL 7043877, at *1. This holding is equally applicable here.

147.    For these reasons, the MFN Rule violates the requirements of the APA and the Medicare Act, and should be held unlawful and set aside.

## SECOND CAUSE OF ACTION

### *(Declaratory/Injunctive Relief – The MFN Rule is Beyond the Secretary's Testing Authority and Thus is in Excess of Statutory Authority and Ultra Vires)*

148.    The prior paragraphs of the Complaint are incorporated by reference.

149.    Executive agencies and officers may act only pursuant to delegated authority. When an executive officer takes action outside of that authority, courts may intervene to declare the action to be in excess of statutory authority under the APA, *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 845 (9th Cir. 2020) ("An agency action must be 'set aside' if it is 'not in accordance with law,' or 'in excess of statutory jurisdiction, authority, or limitations.' (citing 5 U.S.C. § 706(2)(A), (C))), or *ultra vires*, *see Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020) ("[g]enerally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers" (citation omitted)), *cert. granted*, No. 20-138, 2020 WL 6121565 (U.S. Oct. 19, 2020).

150.     These mechanisms require courts to reestablish limits of executive branch authority and to protect the rights of injured parties through the courts' equitable jurisdiction. And courts presumptively have jurisdiction to review these claims, even when a statute includes a review-limiting provision such as 42 U.S.C. § 1315a(d)(2). *See Sierra Club*, 963 F.3d at 891 ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (same).

151.     HHS lacked authority to issue the MFN Rule under the provision allowing the Secretary "to test innovative payment and service delivery models to reduce program expenditures" while "preserving or enhancing the quality of care furnished to individuals." 42 U.S.C. § 1315a(a)(1).

152.     The MFN Rule is *ultra vires* and in excess of statutory authority because it is not a "test" of a "payment and service delivery model[]" that "addresses a defined population for which there are deficits in care." 42 U.S.C. § 1315a. It is instead an effort to implement what the President has openly described as a "national policy" that is contrary to an express Act of Congress. It applies nationwide, governs reimbursement rates for nearly all providers, and resets by administrative fiat the price Medicare will pay for treatments that accounted for about three quarters of its Part B drug expenditures last year. The narrow testing provision does not give HHS authority to issue a sweeping rule that sets aside fundamental aspects of the Medicare statute on a nationwide basis to implement a national policy set forth in an Executive Order.

153.     Under the statute, a "test" must involve a model that "addresses a defined population." 42 U.S.C. § 1315a(b)(2)(A). The MFN Rule, however, applies to *all* patients covered by Medicare Part B as their primary payer, and who receive treatment from any but a tiny handful of excluded providers. 42 C.F.R. §§ 513.2 (defining "MFN Beneficiary"), 513.100(b)-(c) (defining providers as mandatory participants by default, subject to narrow exclusions).

154.     Similarly, a "test" is supposed to be conducted in two phases, 42 U.S.C. § 1315a(b), (c), and the second phase is supposed to "expand . . . the duration and the scope of a model that is being tested under subsection (b)." *Id.* § 1315a(c). But here, the entire United States, all primary Part

37

B beneficiaries, nearly all Part B providers, and about three quarters of Part B's drug spending are already subject to the supposed "Phase I test."

155.     The statute authorizes the Secretary to waive the Medicare Act's reimbursement pricing provisions "solely for purposes of carrying out this section with respect to testing models described in subsection (b) [Phase I]," *id.* § 1315a(d)(1), and directs the Secretary to submit recommendations "for legislative action to facilitate the . . . expansion of successful payment models." *Id.* § 1315a(g). These provisions underscore the limited nature of a test. A *de facto* nationwide alteration of Part B reimbursement prices cannot legitimately be achieved through use of "waiver" authority to conduct a "test," but instead is to be achieved through legislation that codifies a successful model. Yet here, the MFN Rule effectively alters the Medicare reimbursement formula—on a nationwide basis for seven full years—for the overwhelming majority (and a potentially increasing percentage) of Medicare Part B drugs.

156.     The President's own statements further confirm that the MFN Rule is intended to have a broader effect than the statute allows, and is thus in excess of the Secretary's authority or *ultra vires*. The President stated that his original (and unreleased) Executive Order on the MFN Rule would "completely restructure the prescription drug market."[34] The September 13, 2020 Executive Order states that it is "the policy of the United States that the Medicare program should not pay more for costly Part B or Part D prescription drugs or biological products than the most-favored nation price." Exec. Order No. 13,948, 85 Fed. Reg. 59,649, at § 2(a). The President has since stated that "My Most Favored Nation order will ensure that *our Country* gets the same low price Big Pharma gives to other countries."[35] And, the President has proclaimed that his plan would reduce prescription drug prices *generally*, and not for a limited population. For example, on July 30, 2020, he stated that "Drug prices will soon be lowered massively."[36] And on August 2, 2020, he stated:

---

[34] Remarks, The White House, Remarks by President Trump at Signing of Executive Orders on Lowering Drug Prices (July 24, 2020 from 3:45 PM ET to 4:28 PM ET), https://tinyurl.com/yxhpxvbs.
[35] @realDonaldTrump, TWITTER (Sept. 30, 2020, 2:58 PM), https://tinyurl.com/yy4nea22 (emphasis added).
[36] @realDonaldTrump, TWITTER (July 30, 2020 at 9:44 AM), https://tinyurl.com/y5y4b9ga.

"YOU KNOW THAT DRUG PRICES ARE COMING DOWN, BIG. Favored Nations Clause means USA will pay the lowest price of any nation in the World. Never done before. Watch!!!"[37]

157.     Because the MFN Rule will alter Part B reimbursements nationwide, it will effectively repeal the statutory ASP provisions. *See* 42 U.S.C. § 1395w-3a(b)(1)(B), 1395w-3a(c). The Secretary's waiver authority extends only "as may be necessary *solely* for purposes of carrying out this section *with respect to testing models described in subsection (b)*[.]" 42 U.S.C. § 1315a(d)(1) (emphasis added) (relating to Phase I tests). Congress could not have intended this limited testing provision to give the Secretary virtually untrammeled power to supersede the rest of the carefully constructed statutory structure. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

158.     The statutory "Access to Therapy" provision further confirms that the MFN Rule exceeds statutory authority and is *ultra vires*, because it will create "unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impede[] timely access to health care services" and "limit[] the availability of health care treatment for the full duration of a patient's medical needs," by decreasing access to drugs and innovation into new therapies. 42 U.S.C. § 18114; *see Planned Parenthood of Md. v. Azar*, 2020 WL 3893241, at *9 (D. Md. July, 20 2020), *appeal docketed*, No. 20-2006 (4th Cir. Sept. 18, 2020). Indeed, HHS acknowledges that, as a result of the MFN Rule, some Medicare patients "may experience access to care impacts," including receiving inferior therapies with "lower efficacy or greater risks," or may even end up "postponing or forgoing treatment" altogether. 85 Fed. Reg. at 76,244. It estimates that, during its first year, the MFN Rule could cause nearly 10% of Medicare patients to lose access to their Medicare Part B drugs, and that this percentage could increase to nearly 20% by its third year of operation. Furthermore, HHS acknowledges that the "potential loss of access to certain drugs" may cause patients to incur "additional medical expenses" overall. *Id.* at 76,247. The Rule exempts COVID-19 treatments on this basis, but has no explanation why the same concerns do not apply to treatments for other

---

[37] @realDonaldTrump, Twitter (Aug. 2, 2020 at 8:01 AM), https://tinyurl.com/y6qjt7h8.

conditions as well.  The Rule therefore violates the statutory requirements that HHS "shall not

promulgate any regulation" that "impedes timely access to health care services," "limits the

availability of health care treatment," or "creates any unreasonable barriers to the ability of

individuals to obtain appropriate medical care." 42 U.S.C. § 18114.

159.     For these reasons, the MFN Rule must be declared unlawful and enjoined because it

exceeds HHS's authority under the Medicare Act and is *ultra vires*.

### THIRD CAUSE OF ACTION

### *(Declaratory/Injunctive Relief - Violation of the Non-Delegation Doctrine, Separation of Powers, and Presentment Clause)*

160.     The prior paragraphs of the Complaint are incorporated by reference.

161.     The Constitution provides that "[a]ll legislative Powers herein granted shall be vested

in a Congress of the United States." U.S. Const., Art. I, § 1.

162.     "From this language the Court has derived the non-delegation doctrine: that Congress

may not constitutionally delegate its legislative power to another branch of Government." *Touby v.

United States*, 500 U.S. 160, 164–65 (1991). In exercising its legislative power, Congress may leave

a certain amount of discretion to executive agencies and officials, but it must guide the exercise of

that discretion with an "intelligible principle." *Gundy v. United States*, 139 S. Ct. 2116, 2123

(2019).[38]

163.     Although cloaked as a "test," the MFN Rule purports to discard Medicare's statutory

pricing nationwide, and adopt a drastically different pricing system, for nearly the entirety of

Medicare Part B's drug expenditures for the better part of a decade. *See* ¶¶ 80, 83, 154–55, *supra.*

164.     If the MFN Rule is not *ultra vires* and instead reflects a legitimate use of the

Secretary's authority to "test" a "payment and service delivery model[]" that "addresses a defined

population," then the statute violates the non-delegation doctrine. As interpreted by the Secretary in

promulgating the MFN Rule, none of the apparent limitations of the statute actually constrains the

---

[38] Concurring and dissenting Justices in *Gundy* expressed an interest in re-examining the non-delegation doctrine. *See Gundy*, 139 S.Ct. at 2130–31 (Alito, J., concurring in the judgment) (stating that "[i]f a majority of this Court were willing to reconsider the approach we have taken for the past 84 years, I would support that effort."); 139 S.Ct. at 2141 (Gorsuch, J., dissenting) (criticizing the "intelligible principle" test).

1    Secretary's discretion, and there is no "intelligible principle" to which the Secretary is directed to

2    conform.

3        165.    For similar reasons, if Section 1315a(d) is interpreted so broadly as to authorize the

4    MFN Rule, it would violate the Presentment Clause and the constitutional principle of separation of

5    powers. The executive branch cannot repeal provisions in a statute. *See Clinton v. City of New York*,

6    524 U.S. 417, 445 (1998) ("[W]hen enacting the statutes discussed in [*Marshall Field & Co. v.*

7    *Clark*, 143 U.S. 649 (1892)], Congress itself made the decision to suspend or repeal the particular

8    provisions at issue upon the occurrence of particular events subsequent to enactment, and it left only

9    the determination of whether such events occurred up to the President."); *Cnty. of Santa Clara v.*

10   *Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017) (the President "cannot 'repeal [] or amend[] parts

11   of duly enacted statutes' after they become law" (quoting *Clinton*, 524 U.S. at 439)).

12       166.    If the MFN Rule is not *ultra vires*, it would give the Secretary essentially unlimited

13   authority to repeal large portions of the Medicare statute, in violation of the Presentment Clause and

14   the separation of powers.

15       167.    Therefore, if the MFN Rule is authorized by statute, then Section 1315a(d) violates

16   Article I, Section 1 of the U.S. Constitution and the Non-delegation Doctrine, and the Presentment

17   Clause in Article I, Section 7.

18                              **PRAYER FOR RELIEF**

19       **WHEREFORE,** Plaintiffs respectfully request judgment against Defendants as follows:

20   •    A declaration that the MFN Rule is procedurally invalid because it lacks the requisite

21        notice and comment under the APA and the Medicare Act; that the MFN Rule is *ultra*

22        *vires* and exceeds the Secretary's Phase I testing authority; or that the statute's waiver

23        provision violates the non-delegation doctrine, the Presentment Clause, and the

24        separation of powers, to the extent it permits the Secretary to exercise untrammeled

25        nationwide waiver authority over the Medicare Act.

26   •    A preliminary and permanent injunction prohibiting defendants from implementing or

27        enforcing the MFN Rule, and vacating and setting the MFN Rule aside;

28   •    Award of plaintiffs' attorney fees and costs; and

---

41

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 20-CV-08603

1          •      Such other relief as this Court may deem just and proper.

2

3

4

    DATED: December 4, 2020

5                                                    By: /s/ *Naomi A. Igra*_____

6                                                    Naomi A. Igra (SBN 269095)
                                                     naomi.igra@sidley.com
7                                                    SIDLEY AUSTIN LLP
                                                     555 California Street
8                                                    Suite 2000
                                                     San Francisco, CA 94104
9                                                    Telephone: +1 415 772 7495
                                                     Facsimile: +1 415 772 7400
10

11                                                   Joseph R. Guerra (*pro hac vice* to be
                                                     submitted)
12                                                   jguerra@sidley.com
                                                     Erika L. Maley (*pro hac vice* to be submitted)
13                                                   emaley@sidley.com
                                                     Sean C. Griffin (*pro hac vice* to be submitted)
14                                                   sgriffin@sidley.com
                                                     SIDLEY AUSTIN LLP
15                                                   1501 K Street, N.W.
                                                     Washington, D.C. 20005
16                                                   Telephone: +1 202 736 8228
                                                     Facsimile: +1 202 736 8711
17

18                                                   *Attorneys for Plaintiffs Biotechnology*
                                                     *Innovation Organization and Biocom*
19                                                   *California*

20                                                   Beth S. Brinkmann (SBN 129937)
                                                     bbrinkmann@cov.com
21                                                   Mark Mosier (*pro hac vice* to be submitted)
                                                     mmosier@cov.com
22                                                   Conrad Scott
                                                     cscott@cov.com
23                                                   COVINGTON & BURLING LLP
                                                     One CityCenter
24                                                   850 Tenth Street, N.W.
                                                     Washington, D.C. 20001
25                                                   Telephone: +1 202 662 5312
                                                     Facsimile: +1 202 662 6291
26

27                                                   *Attorneys for Plaintiff*
                                                     *California Life Sciences Association*

28

                                             42
    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 20-cv-08603